## C. S. FOSSETT v. THE ROCK ISLAND LUMBER & MANU- FACTURING COMPANY.

No. 14,584.   (92 Pac. 833.)

SYLLABUS BY THE COURT.

1. MUNICIPAL CORPORATIONS—*Occupation Tax—Refusal to Issue License—Right to do Business.* When a person has com-- plied so far as he can with the provisions of an ordinance re- quiring him to pay an occupation tax, and has tendered the- fee and demanded of the proper officer a license, and the license is refused through no fault of his, it is not unlawful for him, without a license, to engage in an occupation, other- wise lawful, which requires no supervision or regulation.

2. SUBCONTRACTOR'S LIEN—*Evidence of Payments Made to Other Subcontractors.* In a suit against the owner of a building to enforce a subcontractor's lien evidence of payments made by the owner to other subcontractors during the sixty days within which they were entitled to but did not file liens is admissible, and where the cost exceeds the contract price the owner is entitled to credit for such payments to the extent of the pro rata amounts which the other subcontractors would have been entitled to if their liens had been filed.

3. —— *Set-off—Damages for Failure of Contractor to Com- plete the Building in Time.* In a suit by a subcontractor to enforce a lien against the owner of the building the owner may offset any actual damages which he has sustained by reason of the contractor's failure to complete the building in time, provided the damages are such as may be said to have- been in the contemplation of the parties when the contract was made.

Error from Sumner district court; CARROLL L. SWARTS, judge. Opinion filed November 9, 1907. Re-- versed.

*R. L. Holmes,* and *Charles G. Yankey,* for plaintiff in error.

*Dale & Amidon,* for defendant in error.

The opinion of the court was delivered by

PORTER, J.: This is a suit for the foreclosure of a mechanic's lien upon a store building in the city of Caldwell. The lien was a subcontractor's lien for build--

ing material furnished by the lumber company to W. L. Murray, the contractor, and amounted to $1057. The answer of C. S. Fossett, owner of the building, alleged that the Rock Island Lumber & Manufacturing Company was not entitled to recover for the goods sold, because it was unlawfully engaged in business in violation of an ordinance of the city of Caldwell which required the obtaining of a license before engaging in such business. To this defense a reply was filed, alleging that the lumber company had tendered to the city treasurer the amount of this license tax and that the treasurer had refused to accept it, and also that the city officials had not for some years been enforcing the ordinance for an occupation tax. The answer also alleged that the contract price of the building was $3800, for which Murray, the contractor, agreed to furnish all labor and material, and that Fossett had paid all but $128 of the contract price to subcontractors who were entitled to liens. A third defense set up was a breach of the contract on Murray's part, in failing to complete the building within the time specified, and it was alleged that there was nothing due the contractor, the balance of $128 being due the owner as an offset for these damages.

The court made findings of fact and conclusions of law, and rendered judgment for the lumber company as prayed for. Fossett brings this proceeding to reverse that judgment.

In reference to the defense setting up the failure to take out a license, the finding of the court in substance is that since the ordinance went into effect the lumber company had for three years, on the first day of July in each year, tendered to the city treasurer the amount of the license tax for such year, and requested and demanded a license to do business as provided for in the ordinance; that the city treasurer each time refused to accept the tax; and that the mayor and clerk, whose duty it was to issue such licenses, had refused to do so. The court also found that during all that time the city

of Caldwell had refused to issue to any person or firm a license to do business under the ordinance.

The court held as a conclusion of law that this absolved plaintiff from the consequences of the doctrine declared in *Yount v. Denning,* 52 Kan. 629, 35 Pac. 207. It is contended that this was error. There are authorities which support this contention. Some of them we do not regard as squarely in point, for they arose over disputes as to the character and legality of the tender. Such is *Phœnix Carpet Co. v. The State,* 118 Ala. 143, 22 South. 627, 72 Am. St. Rep. 143. The person applying for the license tendered the officer the state tax and refused to pay the county tax. The court, after deciding the county tax illegal, held that appellant was not justified in continuing. in business without a license, but should have resorted to mandamus to compel the officer to issue a license. So, in *City of East St. Louis v. Wider,* 46 Ill. 351, payment of the license fee was tendered in city orders instead of cash and the tender was refused. On a prosecution for doing business without a license it was held that defendant's remedy was by mandamus, and the refusal to issue the license no defense.

It is only by a sort of fiction that the business of selling lumber and building material can be said to require supervision or regulation to the extent of authorizing the imposition of a license tax, except for purposes of revenue. The doctrine of *Yount v. Denning, supra,* that a person who fails to pay an occupation tax cannot recover for his services, is adopted for the protection of the licensing power of the state, not primarily for the benefit of some other person who has had dealings with him and who seeks to avoid the payment of what would be otherwise justly due. A parallel case is *Wicks v. Carlisle,* 12 Okla. 337, 72 Pac. 377, where it was held that a person receiving the services of a real-estate agent who had not taken out an occupation tax, for the same reasons as those relied upon

here, is not in position to urge an objection to a recovery for the services rendered.

Nor can we believe that after the lumber company had tendered the fee and demanded a license, which the officers refused, it was compelled to mandamus the officers before it could lawfully transact any business of the character in which it was engaged. At all events its failure to follow up the·tender and demand by mandamus should not be held to work a forfeiture of its right to recover for merchandise, and thus inure to the benefit of a private individual who was in no respect prejudiced thereby but who retains the consideration. Forfeitures are not favored in law and are despised in equity. In this connection the remarks of Mr. Justice Burch in *The State v. Book Co.*, 69 Kan. 1, 76 Pac. 411, 1 L. R. A., n. s., 1041, are perhaps not inappropriate: "Such an interpretation might attract the enthusiastic admiration of the highwayman, but it has nothing to commend itself to a court of justice." (Page 17.)

The following authorities are believed to support the doctrine which we announce here—that where a person has complied so far as he can with the provisions of an ordinance requiring him to pay an occupation tax, ·and has tendered the fee and demanded of the proper officer a license, and the license is refused through no fault of his, it is not unlawful for him to carry on a business which .is otherwise lawful and which requires no supervision or regulation: Horr & Bemis, Mun. Pol. Ord. § 201; McQuillin, Mun. Ord. § 352; *Prather et al. v. The People,* 85 Ill. 36.

Was it error to refuse to permit the owner to make proof of payment to other subcontractors who had not filed liens? The contract price was $3800. Defendant offered to prove that he had paid to other subcontractors $3671.82 during the sixty days within which they might have filed liens. The objection which was sustained was upon the ground that it was not claimed that any of these other subcontractors had filed liens.

Whether this was error raises the principal, and by far the most important, question in the case. The statute which gives a subcontractor a lien provides:

"Any person who shall furnish any such material or perform such labor under a subcontract with the contractor, or as an artisan or day laborer in the employ of such contractor, may obtain a lien upon such land from the same time, in the same manner and to the same extent as the original contractor, for the amount due him for such material and labor: . . . by filing with the clerk of the district court of the county in which the land is situated, within sixty days after the date upon which material was last furnished or labor last performed under such subcontract, a statement verified. . . . Provided, that the owner of any land affected by such lien shall not thereby become liable to any claimant for any greater amount than he contracted to pay the original contractor; but the risk of all payments made to the original contractor shall be upon such owner until the expiration of the sixty days hereinbefore specified; and no owner shall be liable to an action by such contractor until the expiration of said sixty days, and such owner may pay such subcontractor the amount due him from such contractor for such labor and material, and the amount so paid shall be held and deemed a payment of said amount to the original contractor." (Gen. Stat. 1901, § 5119.)

Defendant contends that a subcontractor has a lien from the time he furnishes the labor or material, and that he may lose it by a failure to file his lien statement in time, or by failing to give the proper notice; but that these requirements simply affect his remedy. On the other hand, it is contended that it is only by virtue of a strict compliance with all requirements of the statute that one who has furnished labor or material under a subcontract can acquire a lien, and that until all these requirements are fulfilled he has nothing.

In *Nixon v. Cydon Lodge,* 56 Kan. 298, 43 Pac. 236, certain subcontractors furnished labor and material while the law of 1872 was in force, and perfected their liens under the law of 1889. It became necessary to consider the question whether the liens vested under

the old law, and Mr. Justice Johnston, speaking for the court, said: "The vesting of the lien is one thing and the manner of its enforcement is another" (page 305), citing *Groesbeck v. Barger,* 1 Kan. App. 61, 41 Pac. 204. In the latter case the language of Judge Garver is as follows:

"The steps required to be taken, by filing a verified statement within sixty days after the completion of the building and serving a copy on the owners, were not required in order to secure the right to a lien, but were made necessary merely in order to preserve a right already acquired by the furnishing of materials. They were but proceedings provided for preserving and enforcing the lien, and must be classed as mere remedies to be pursued by the lien claimant for the enforcement of the security given him by the statute." (Page 62. See, also, *Hotel Co. v. Hardware Co.,* 56 Kan. 448, 43 Pac. 769; 20 A. & E. Encycl. of L. 384.)

In *Central Trust Co. v. Richmond, N., I. & B. R. Co.,* 68 Fed. 90, 15 C. C. A. 273, 41 L. R. A. 458, a statute of Kentucky providing for subcontractors' liens upon railroads, which is in all essentials similar to our statute, was construed to mean that the subcontractor has an incipient or inchoate lien arising from furnishing the labor or material until perfected by filing the required notice, etc., or lost by failure to do so within the prescribed time. It cannot be doubted that under our statute he has a right to a lien, during the sixty days following the furnishing of the labor or material, which is superior to the right of any subsequent purchaser or mortgagee. True, this right to a lien may be lost by failing to comply with the statute, or it may ripen into a perfect lien by compliance therewith. It seems the better reasoning to hold that this lien is an incipient, inchoate one until perfected by compliance with the statutory provisions or lost by failure so to comply. But this question may be said to be academic, and no matter how it be determined it cannot solve the question at issue, for in the offer of the testimony it was conceded that these subcontractors had not filed,

28—76 KAN.

and therefore they had not acquired, statutory liens.
Plaintiff insists that the exact question involved herein
has been decided, and cites *Town Co. v. Morris,* 39
Kan. 377, 18 Pac. 230, the sixth paragraph of the syllabus of which reads as follows:

"Where, in a mechanics'-lien case brought by certain
subcontractors, the court refused to permit the owner
to show how much he had paid to other subcontractors,
*held,* under the circumstances, not to be material error."

In the opinion Mr. Justice Valentine said of the refusal to permit the question to be answered:

"We cannot say that there was any error in this.
What other contractors there were, or whether there
were any or not, or whether there were any other lienholders or not, is not shown, and no claim is made that
any considerable sum was paid to subcontractors.
Fisher was to have $3500 for building the hotel, and
the claims of the plaintiffs, M. T. & G. Morris, and the
defendants, Lee & Viele, in the aggregate, amount to
only $635.69; hence it could make no possible difference
under any interpretation of the law as to how much
the Sharon Town Company paid to the subcontractors,
unless they paid more than the difference between
$3500 and $635.69, to wit, $2864.31. No claim is made
that they paid any such amount to the subcontractors,
or to any persons; and no claim is made that the building cost to construct it more than the contract price;
and the contract price is always considered as a fund
from which the subcontractors (such as the plaintiffs
and Lee & Viele were) are entitled to receive their
pay, provided, of course, that they properly file their
mechanics'-lien statements. (*Clough v. McDonald,* 18
Kan. 114, 118.) No contractor or subcontractor has
any lien on this fund unless he properly files his mechanics'-lien statement." (Page 380.)

In its facts the case is easily distinguishable from
the present one, for here the claim is that the owner
had paid to subcontractors much more than the difference between the amount of the contract price and the
amount claimed to be due plaintiff, and while the answer does not allege that the cost exceeded the contract

price, that appears from the record to be necessarily true. A reasonable inference from the language used in the opinion appears to be that in a case where the claim is made that the owner has paid to other subcontractors more than the difference between the contract price and the amount claimed by the subcontractor seeking to enforce his lien the evidence would be competent. The language used at the close of the paragraph quoted—that "no contractor or subcontractor has any lien on this fund unless he properly files his mechanics'-lien statement" (page 381), while a correct statement of the law, can hardly be said to control or determine the question we are considering. It was *dictum* as applied to the facts in that case.

In *Clough v. McDonald,* 18 Kan. 114, it was expressly held, following *Shellabarger & Leidigh v. Thayer,* 15 Kan. 619, and *Delahay v. Goldie,* 17 Kan. 263, that the contract price constitutes a fund from which the subcontractors are to be paid for their labor or material furnished. A part of the syllabus reads as follows:

"And if such fund is not sufficient to pay the whole amount of all the claims of the subcontractors who are entitled to liens . . . then such claims must be paid from such fund pro rata."

The contract price in that case was $1900. Clough was the owner. McDonald was the subcontractor who sought to enforce a lien for $157.78. Clough had already paid the $1900, including $1800 to various other subcontractors. It was claimed that because of these payments McDonald was not entitled to any lien. The district court held that McDonald was entitled to a lien for a portion of the amount claimed, to be determined according to certain instructions to the jury. In the opinion it was said:

"This we think was right. As we have before said, every subcontractor is, under the law, entitled to sixty days . . . within which to file his lien; and he must file it within that time, or lose it. And the owner

of the building cannot be compelled to pay anything to any person prior to that time.   .   .   .   Hence, at the end of the sixty days, and before the owner can be compelled to pay anything to any person, he may know precisely to whom he is liable, and the amount due to each.   If the contract price will pay all the claims, he should pay all.   But if it will not pay all, as in this case, then he must pay the various claimants in proportion to the amount due to each respectively." (Page 118.)

This case is frequently cited as authority for the proposition that in determining who shall participate in the pro rata distribution the claims of those subcontractors who have filed liens are to be considered; but an examination of the record discloses that no objection was made to the proof on the part of the owner that he had paid other subcontractors, and the record does not show that any of them had filed liens.

An older case is *Shellabarger & Leidigh v. Thayer,* 15 Kan. 619.   There the contract price was $1300, $800 of which was paid before the commencement of the work.   The subcontractor furnished material to the amount of $900.   It was held that the subcontractor's lien was not limited by the amount due the contractor after payment of the $800, but extended to the whole contract price.   In the opinion Mr. Justice Brewer said :

"Three things are clear from this : First, that the subcontractor has a lien for his work or material; second, that the limit of such lien is the amount contracted to be paid to the original contractor; and, third, that the risk of all payments up to a certain date is upon the owner.   Now the money contracted to be paid in this case was $1300.   That, then, is the limit of the subcontractor's lien.   Not the amount due at the time of notice, or delivery of material, but the amount contracted to be paid.   True, the owners had paid $800 of that amount, but the risk of such payment was upon them.   The very purpose of this clause in the statute was to prevent the cutting off of the liens of subcontractors by early payments to the contractor.   And this is a clause the exact counterpart of which we have

not found in the statutes of any other state." (Page
623.)

The question presented here is not the same; it is
whether the purpose of the clause in the statute placing
upon the owner the risk of all payments made before
the time expires for filing a subcontractor's lien is
to prevent the cutting off of subcontractors' liens by
early payments made to other subcontractors who hap-
pened not to have filed liens.

The general doctrine of *Clough v. McDonald* and
*Shellabarger & Leidigh v. Thayer* has been repeatedly
affirmed. (*Macdonald v. Seaton,* 27 Kan. 672; *Craw-
ford v. Blackman,* 30 Kan. 527, 1 Pac. 136; *Davis v.
Bullard,* 32 Kan. 234, 4 Pac. 75; *Lumber Co. v. Allen,*
52 Kan. 795, 35 Pac. 781; *Hotel Co. v. Hardware Co.,*
56 Kan. 448, 43 Pac. 769; *Nixon v. Cydon Lodge,* 56
Kan. 298, 43 Pac. 236.)

The learned counsel for plaintiff suggest that thirty-
two years of repeated, uniform declarations of this
court upon any one proposition of law ought to be an
absolute bar to any further consideration of that prop-
osition, and ask of what benefit is the supreme court
to the people if it unsettle the law every time there is
a change in its membership. The difficulty with this
suggestion, as applied to this case, is that it assumes
that the question involved has been repeatedly passed
upon and the law thereon settled; but we do not under-
stand that this question has ever been presented to the
court or decided. For that reason, and because the
question is not free from difficulty, this cause was or-
dered reargued.

The decisions that we have referred to have set-
tled a number of questions arising upon the statute
which we have no disposition to unsettle. It is the
established law that the contract price constitutes a
fund to which the subcontractors may look for pay-
ment of their liens, and that only such part of the con-
tract as relates to the amount to be paid binds them;
that all payments made by the owner to the original

contractor before the time expires for filing subcontractors' liens are made at the owner's risk; which means that if there shall not remain of the contract price a sufficient sum to meet all the claims the owner must pay each subcontractor his pro rata share, and is not entitled to take credit for any sums paid to the contractor; this because the statute in plain words so provides. It is also settled, although the statute does not in express terms so state, that where some of the subcontractors have perfected their liens, and the owner has paid them in full, he does this at his peril; and if afterward it appear that there is not enough of the contract price remaining to satisfy all the subcontractors' liens there must be a prorating between them, and the owner may take credit only for payments made to the other subcontractors to the extent of their pro rata share. To illustrate: The owner may have paid some subcontractors who have filed liens their claims in full. Afterward, when it appears that in computing all of such claims the fund will only meet 80 per cent. of the amount due, the owner is entitled to credit only for 80 per cent. of the amount actually paid, and must stand the loss of the 20 per cent. or look to the contractor. As observed, the statute does not in express terms say that this shall be the rule, but it is the logical result of the decided cases cited. As against the contractor the statute even encourages the owner to pay "such subcontractor" the amount due him. Presumably, however, this refers to a subcontractor who has filed his lien. It may be further observed that in determining who of the subcontractors are entitled to participate in the prorating of the fund only those who have established legal liens are entitled to share. (*Lumber Co. v. Allen*, 52 Kan. 795, 35 Pac. 781.) A subcontractor who has lost his lien by failure to give the notice or to file his statement has no right to share in the distribution and no claim against the property.

Does it follow from these well-established princi-

ples that in a case where the cost exceeds the contract
price, and the owner has in good faith paid to other
subcontractors valid claims which if not paid could
have been and in all likelihood would have been per-
fected, and thus become proratable, he is not to
be allowed credit for what would have been the pro
rata share of the other subcontractors? Apart from
the statute and upon purely equitable considerations
the answer is not difficult. Indeed, the only conceivable
way in which a subcontractor in the situation of the
plaintiff could be prejudiced is upon the supposition
that had the owner withheld all payments to other sub-
contractors some of them might have neglected their
claims and failed to perfect liens, resulting in a larger
percentage to him. It is argued that he is prejudiced
in another way and has a right to look to the record
of mechanics' liens to determine whether he will fur-
nish labor or material, and that he has the right to as-
sume that only those filed will participate in the event
the contract price proves to be insufficient. But, prac-
tically, there is nothing of force in this claim. It is
doubtful if in actual practice any one examines the lien
record to ascertain the amount of liens filed before he
determines to furnish labor or material. To do so
effectually would require him to examine it from day
to day. It might show no liens one day and several
the day following, because the time for filing the vari-
ous liens would expire at different dates, dependent
upon the time when the labor or material was fur-
nished. Moreover, the argument is based upon the
assumption that the statute requiring liens of subcon-
tractors to be filed was enacted for the protection of
the other subcontractors. We understand that the
primary purpose of the statute is to furnish protection
to the owner, so that he may withhold payments to the
contractor and may know finally what distribution
must be made of the contract price. It does not seem
plausible that the legislature intended by the require-
ment to enable one subcontractor to make the kind of

a claim that is insisted upon here, and to say to the owner: "Although you have paid a valid claim to another subcontractor who furnished labor and material used in the completion of the contract, which claim would have been entitled to prorate with mine had it been filed, and although I have not in any way been prejudiced by the failure to file it, yet you shall not take credit for the proportionate amount which I concede would have been due thereon had it been filed."

It frequently occurs that buildings are in the process of construction for several months, and sometimes for longer than a year. It is seldom that a contractor has the means or is willing to pay the claims for labor and material. In ordinary cases some one must pay the material men at least a portion of their claims; and it is usual for the wage-earners to insist upon full payment at the end of the week. In answer to this it is suggested that the common practice is to rely upon a bond by the contractor to protect the owner against liens, but this is often impracticable, and at best furnishes but an inadequate safeguard to the owner. It is true that the statute contemplates that the owner may withhold all payments until the time for filing the last lien, but in practical operation this right is a barren one, and if generally insisted upon would result in very few building contracts being carried out.

It is perhaps surprising that this question has not been more frequently before the courts, as it presents a situation which must frequently arise. The decided cases, however, seem to be limited in number; nor have we found an intelligent discussion of the question in the text-books or cyclopedias. Two reasons suggest themselves: (1) Few, if any, of the mechanic's-lien statutes contain the exact language of ours in placing upon the owner the risk of payments made before the expiration of the time for filing liens, though several contain the provision that in no event shall the aggregate amount of the liens exceed the contract price; and in the majority of statutes the subcontractor is given

Fossett v. Lumber Co.

a direct lien, as in ours.  (2) The other reason which suggests itself is that the claim of plaintiff is so palpably unjust to the owner, and rests upon such technical grounds that it has been seldom raised.

Counsel for defendant have cited us to some decisions of the California court, but the differences between the statute there and ours render the cases of little aid in reaching a conclusion upon the question here.  The case of *Central Trust Co. v. Richmond, N., I. & B. R. Co.,* 68 Fed. 90, 15 C. C. A. 273, 41 L. R. A. 458, is very much like the present case.  The statute construed is the Kentucky statute giving to laborers and material men liens upon the property of railroads, and, like our mechanic's-lien statute, it is provided that the liens shall in no case be for a greater amount in the aggregate than the contract price, but, unlike ours, provides expressly for a pro rata distribution.  It was held, as observed *supra,* that the lien originated with the furnishing of the labor or material, and was an incipient, inchoate lien until lost by failure to file, or perfected by filing, etc.  It was also held that to limit the distribution to those claims which had been perfected by statutory notice would be unjust to the owner, who had the right to distribute the contract price during the progress of the work, and that if by premature distribution one incipient lienor were paid more than his proportion the owner would suffer the loss and be remitted to his remedy against the original contractor.

The case is squarely in point unless the absence from the statute of the provision contained in ours placing the risk of certain payments upon the owner is sufficient to distinguish it.  While this provision is not in the Kentucky statute, in all other essentials the statutes are alike.  Both provide that subcontractors' liens shall be direct and not by subrogation.  Now, wherein does the absence of this provision affect the rights of the parties or detract from the weight of the decision as authority?  Our statute reads: "but the risk of all

payments made to the original contractor shall be upon such owner until the expiration of the sixty days hereinbefore specified." (Gen. Stat. 1901, § 5119.) As observed, this has been interpreted to mean also that all payments made by the owner to subcontractors who have filed liens shall be at the owner's risk, not only until the expiration of the sixty days, but always. At the final adjustment he is only entitled to credit for the pro rata amount paid. Conceding that it is still the fact, as remarked by Mr. Justice Brewer in *Shellabarger & Leidigh v. Thayer*, 15 Kan. 619, that the statute of no other state contains this provision, it will be found by comparison that notwithstanding the absence of such a provision it is the general rule, where the subcontractor is given a direct lien, not by subrogation but independent of the lien of the original contractor, that the same construction prevails; and all payments made to the contractor, and all payments made to any subcontractor in excess of his proportionate share, are made at the owner's risk. Obviously it will not do to place too great a strain upon this particular provision of our statute.

The owner ought to be permitted to pay valid claims of subcontractors who have furnished labor or material and have completed their contracts. The very act of furnishing the labor or material has given them the right to look to the property for payment. They have a right to liens, and hold claims which can only be satisfied by payment. If the owner is willing to pay them and to assume the risk in case he pays more than their pro rata share, this is all that should be required of him. To conclude, there is no express provision in the statute denying to the owner the right to take credit for payments made in good faith under such circumstances, nor has it been decided that any of its terms are intended to meet the situation presented. In view of the great injustice which a different interpretation would impose upon the owner, and the confusion which would follow in its practical operation,

we hold that the owner is entitled to take credit for such payments to the extent of the proportionate share of each subcontractor's claim, and that it was error to sustain the objection.

Another difficult question is presented by the refusal to permit defendant to prove the rental value of the building from March 1, 1903, when, according to the contract, it was to have been completed, and September 1, 1903, when it was completed. The offer was made for the purpose of proving, as an offset to the subcontractor's lien, damages caused by the fault of the contractor. Our statute giving subcontractors a lien reads as follows:

"Provided, that the owner of any land affected by such lien shall not thereby become liable to any claimant for any greater amount than he contracted to pay the original contractor." (Gen. Stat. 1901, § 5119.)

Plaintiff contends that this question is ruled by the cases in which it has been declared that the subcontractor is not bound by any of the terms and conditions of the original contract except those terms which prescribe the amount the owner is to pay.

In *Morehouse v. Moulding et al.*, 74 Ill. 322, where the statute at the time provided that in no case should the owner be compelled to pay a greater sum than the price stipulated in the original contract, it was held that damages for the failure to fulfil a contract should be deducted from the contract price, and the balance prorated among the subcontractors. And in *Biggs et al. v. Clapp et al.*, 74 Ill. 335, the same clause of the Illinois statute was construed in a case where the contractor abandoned the contract and the owner was obliged to complete it himself. It was held that where the owner was obliged to pay more than the contract price to complete the building the subcontractors were not entitled to any lien. This court, in *Hotel Co. v. Hardware Co.*, 56 Kan. 448, 43 Pac. 769, has laid down the same rule.

It seems difficult to give a reason for allowing the

owner credit for additional sums paid to carry out an abandoned contract, and thus reduce the fund upon which the subcontractor may rely, which would not apply with equal force to the allowance of damages occasioned by the fault of the contractor in other respects. The amount the owner contracts to pay is a certain sum conditioned upon full performance of the contract according to its terms. (*Wright v. Pohls and wife*, 83 Wis. 560, 53 N. W. 848.) Any damages resulting from the fault of either party, which can be said to have been in the contemplation of the parties at the time the contract was made, should properly figure in the amount the owner contracted to pay. If such damages result in his favor the amount he contracted to pay would be so much less than the amount named as the contract price. Stating it in different language, the owner contracts to pay a certain sum conditioned upon the fulfilment of the contract, and if any damages are caused by the contractor he agrees to pay as much less as the damages amount to.

The owner may recoup damages against the contractor arising out of the failure of the latter faithfully to perform the contract, and without regard to the absence of specific terms in the contract providing for damages. He may show as against the contractor that the building was not completed, or not completed in time, or that defective materials were used. Why should he not be permitted to show these counter-claims when it is sought to recover from him by one who has no contractual relations with him and who seeks to recover a debt due from the contractor? The only answer to this is that the statute fixes the extent of his liability to the subcontractor at the amount which he agreed to pay the contractor, regardless of whether the contract is fulfilled or not. Giving an offset for the cost of completing the building is, however, when analyzed, practically an allowance of damages for failure to complete. The measure of the damages is the ascertained cost of completion, but the principle is the same

Fossett v. Lumber Co.

as though the contract provided for a certain sum as liquidated damages for each day's delay, and numerous decisions authorize the allowance of damages liquidated in this manner by the terms of the contract, even in suits to enforce a subcontractor's lien.

With respect to this question also it may be observed that the authorities are not so numerous as might be expected upon a question so likely to arise in the adjustment of building liens, nor are many of them clear or decisive. Some of the text-writers say that damages caused by the contractor may be offset against the lien of a subcontractor, but many of the cases referred to in the notes do not bear out the text. Thus Phillips on Mechanics' Liens cites *Millsap v. Ball*, 30 Neb. 728, 46 N. W. 1125, relied upon by the defendant. The case, however, is not an authority. There is in the opinion a statement that damages caused by a contractor may be offset against the lien of a subcontractor, but it appears on examination to be mere *dictum*. Some of the other cases cited by the defendant were suits by the original contractor, and others are based upon statutes which expressly declare that the lien of the subcontractor is limited to "what may be due the contractor," leaving little room for doubt as to the proper construction. In some states, notably Michigan, the statute expressly provides that the owner may recoup damages sustained through the failure or omission of the contractor. (*Smalley v. Gearing*, 121 Mich. 190, 79 N. W. 1114, 80 N. W. 797.) Damages caused by the fault of the contractor have been allowed against subcontractors in the cases of *M'Bean v. Kinnear*, 23 Ont. (Can.) 313, *Julin v. Ristow Poths Mfg. Co.*, 54 Ill. App. 460, and *Cheney et al. v. Troy Hospital Association*, 65 N. Y. 282. (See, also, 20 A. & E. Encycl. of L. 456 and cases cited; Boisot, Mechanics' Liens, § 589.)

It is said in Phillips on Mechanics' Liens, section 62*g*:

"The authorities seem to be unanimous that, where the extent of the owner's obligation to pay is limited to the price stipulated in his contract, the subcontractor's

right is confined to what may be due the contractor after the completion of the contract."

In Massachusetts the subcontractor is entitled to a direct lien, and there is no provision limiting the owner's liability to the amount named in the contract. For that reason it was held, in *Bowen v. Phinney*, 162 Mass. 593, 39 N. E. 283, 44 Am. St. Rep. 391, that a subcontractor was entitled to his lien notwithstanding the contractor violated the contract and used poor materials. The opinion recognizes that in other states, where the owner's liability is limited to the amount of the contract price, a different rule obtains, and *Wright v. Pohls and wife*, 83 Wis. 560, 53 N. W. 848, and *Morehouse v. Moulding et al.*, 74 Ill. 322, are referred to.

The conclusion we have reached is that, giving a reasonable construction to our statute, it should be held that the owner may, in a suit by a subcontractor, offset any actual damages caused by the failure of the contractor to complete the building in time, provided, of course, the damages are such as may be said to have been in the contemplation of the parties when the contract was made.

The judgment is therefore reversed, and the cause remanded for another trial.

MASON, SMITH, GRAVES, BENSON, JJ., concurring.

JOHNSTON, C. J. (dissenting) : I dissent from the rulings in the second and third propositions of the syllabus and corresponding portions of the opinion.

BURCH, J. (dissenting) : I have such grave doubts respecting the soundness of the second paragraph of the syllabus that I am constrained to withhold my assent to it and to corresponding portions of the opinion.